IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | |
|---|---|
| PHILLIP EDWARD MCAFEE, III,  )<br>    Plaintiff,  )<br>)<br>v.  )<br>)<br>CAROLYN W. COLVIN,  )<br>Commissioner,  )<br>Social Security Administration,  )<br>    Defendant.  ) | Civil Action No. 5:15-cv-00046<br><br>REPORT AND RECOMMENDATION<br><br>By:    Joel C. Hoppe<br>United States Magistrate Judge |

    Plaintiff Phillip Edward McAfee, III, asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the applicable law, and the parties' briefs and oral arguments, I find that the Commissioner's decision is not supported by substantial evidence. Therefore, I recommend that the presiding District Judge **GRANT** McAfee's Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 15, **REVERSE** the Commissioner's final decision, and **REMAND** this case for additional administrative proceedings.

I. Standard of Review

    The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

1

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996) (internal quotation marks omitted)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant: (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional

2

capacity; and, if not (5) whether he or she can perform other work. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

McAfee filed for DIB and SSI on October 4, 2011. Administrative Record ("R") 117, ECF No. 9. He was thirty-seven years old at the time, *id.*, and had previously worked as a telemarketer, construction worker, and fast food worker, R. 285. McAfee alleged disability beginning July 11, 2011, because of gout, tendonitis and aneurysm in his right hand, right radial artery bypass surgery, and temporomandibular joint disorder. R. 117. Disability Determination Services ("DDS"), the state agency, denied his claims initially and on reconsideration. R. 117–32, 135–52. McAfee appeared with an attorney at an administrative hearing on September 27, 2013. R. 57–116. He testified to his medical conditions and the limitations those conditions caused in his daily activities, R. 63–102, and his girlfriend, Heather M. Royer, testified to the same, R. 102–05. A vocational expert ("VE") also testified about McAfee's work experience and his ability to return to his past work or to perform other work. R. 105–15.

The ALJ denied McAfee's applications in a written decision dated December 31, 2013. R. 28–50. He found that McAfee had the severe impairment of right shoulder disorder with neuropathy, but concluded that impairment did not meet or equal a listing. R. 31–33. The ALJ next determined that McAfee had the residual functional capacity ("RFC") to do light work[1] with

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting requirements can perform light work only if he can also "do a good deal of walking or standing, or do

3

some limitations concerning his right upper extremity. R. 33–47. Relying on the VE's testimony, the ALJ concluded that McAfee could not return to his past work as a telemarketer but, in the alternative, could perform other available occupations, such as lobby monitor, checker, and ticket seller. R. 48–50. He accordingly determined that McAfee was not disabled under the Act. R. 50. The Appeals Council declined to review that decision, R. 1–4, and this appeal followed.

III. Discussion

On appeal, McAfee argues that the ALJ erred by: (1) finding that his Ehlers-Danlos Syndrome and mental disorders were not severe impairments, Pl.'s Br. 10–13, ECF No. 14, (2) finding that his shoulder impairment did not meet or medically equal a listing, *id.* at 13–14, (3) incorrectly weighing the opinions of McAfee's treating physicians, *id.* at 14–18, and (4) allowing an alleged bias against disability claims influence his resolution of McAfee's case, *id.* at 18–19.

A. *Severity of McAfee's Mental Disorders*

McAfee alleges that he suffers from depression and personality disorder and argues that the record demonstrates that these conditions constitute a severe impairment.

1. Relevant Records

McAfee's direct treatment for mental health issues began on August 20, 2012, when he went to the Harrisonburg-Rockingham Community Services Board ("HRCSB") on his own initiative. R. 561. Prior to that, McAfee had reported mental health symptoms during doctor's visits for his physical impairments, but had not received a diagnosis or treatment for those symptoms. *See* R. 389 (May 9, 2011, note documenting reports of anxiety, depression, memory impairment, and psychiatric symptoms), R. 440 (December 1, 2011, note documenting reports of anxiety, depression, and memory impairment).

---

some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

At his initial intake evaluation on August 20, McAfee reported problems with anger, anxiety, and mild depression. R. 561–65. He had a history of self-harm, alcohol abuse, and drug abuse. His mental status exam was mostly within normal limits. He was assessed a GAF score of 55[2] and diagnosed with anxiety disorder, not otherwise specified, cannabis abuse, and antisocial personality disorder. R. 561–65. McAfee had a psychiatric evaluation with Thomas Hester, M.D., at HRCSB on October 17, 2012. R. 566–69. His mood was "a mixture of anxiety, depression, and irritability." R. 566. He denied any recent suicidal or homicidal ideation, but endorsed past suicidal thoughts and actions. Dr. Hester assessed a GAF score of 55 and diagnosed alcohol dependence, cannabis dependence, mood disorder not otherwise specified, and antisocial personality disorder. At his next appointment on December 12, 2012, McAfee reported feeling "even more depressed and sleepy." R. 570–71. He denied suicidal ideation and presented with a dysphoric, restricted affect. Dr. Hester wrote that McAfee "appear[ed] to be having a more significant depressive disorder." Dr. Hester assessed the same GAF score and diagnosis and prescribed Cymbalta for his depression. When McAfee returned on January 16, 2013, he reported having a good response from the Cymbalta, and Dr. Hester noted that he "looks brighter today." R. 572–74. He denied suicidal ideation and had a euthymic mood and congruent affect. Dr. Hester assessed the same GAF score, but changed McAfee's diagnosis of mood disorder to major depressive disorder, single episode, unspecified.

---

[2] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into ten 10-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33. A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

A month later on February 20, 2013, McAfee stated that he was going to start a drug and alcohol program and again endorsed major symptoms of depression, including "feeling his family would be better off if he did not live, marked difficulty sleeping, lack of ability to enjoy things, and no interest in sex." R. 831–34. He expressed violent ideation, saying that he "can't let things go." He had a sad and irritable mood with a congruent, dysphoric affect. He had recent memory impairments and impaired attention and concentration, stating that he could not watch an entire television show. Dr. Hester assessed the same GAF score and diagnoses as in January and increased his Cymbalta dosage. On March 1, McAfee endorsed sleep disturbance, low energy, and anhedonia and had a blunted, depressed affect. R. 835. He stated that he had suicidal thoughts "all the time," but did not intend to follow through on them. McAfee appeared less depressed during a therapy session on March 20, 2013, with Allison Garcia, L.P.C., though he was visibly anxious. R. 836. He endorsed sleep disturbance and had an anxious, depressed affect.

McAfee returned to Dr. Hester on March 27, 2013. R. 837–40. He reported that he had run out of Cymbalta and experienced severe withdrawal problems. He drank alcohol and got kicked out of the rehabilitation program for attending a meeting while intoxicated. At one point, he stood and laid in the road, waiting for a car to hit him, but left after someone called the police. He had since gone back on Cymbalta and reported doing better. He denied suicidal ideation on the day of the appointment, but appeared very sleepy with "much slowed speech." His mood was sad, with a congruent affect. Dr. Hester assessed the same GAF score and diagnoses, maintained McAfee's Cymbalta, and added a trial of Deplin. During an April 4 therapy session with Garcia, McAfee reported feeling less stressed and denied any suicidal ideation. R. 841. He endorsed impaired concentration and had an anxious, depressed affect. On April 22, McAfee told Garcia that he recently had experienced increased depression and a feeling that he was worthless and

6

had no purpose in life. R. 842. He endorsed low energy, anhedonia, and impaired concentration and had a depressed affect.

On April 24, 2013, McAfee saw Nickie Spears, M.D., at HRCSB. R. 843–46. He complained of night sweats from the Cymbalta. Dr. Spears wrote that "the medication helps [him] to be less angry and to have better affective control, . . . [but] he still feels depressed and 'numb . . . like I don't have any emotion.'" He did not have any suicidal ideation since his last appointment, though he did report feeling like he did not want to be alive. He had an anxious, sad mood with a blunted, congruent affect, but his attention and concentration were intact. Dr. Spears wrote that his heavy Percocet usage for his physical conditions may interfere with the effectiveness of the Cymbalta. She maintained his GAF score and diagnoses, lowered his Cymbalta dosage, and indicated that she wanted to start him on Wellbutrin if payment assistance could be obtained. On May 14, 2013, McAfee reported to Garcia that he felt miserable, but was sleeping and avoiding situations rather than acting out in anger. R. 847. He endorsed low energy and anhedonia and had a depressed, blunted affect. McAfee returned to Dr. Spears on May 28, 2013, and appeared to be doing better, reporting that his neurologist had taken him off Percocet and he had been able to occasionally smile and laugh. R. 1332–33. He had an anxious, sad mood with a congruent affect that was less blunted than the previous month.

McAfee was admitted to HRCSB's crisis facility from June 24–26, 2013, because of suicidal ideation and complaints of depression, low motivation, and marital discord. R. 1330. When he saw Dr. Spears on July 9, 2013, McAfee reported that the facility had been very helpful, he had increased his Cymbalta dosage, and he was doing better. *Id.* Dr. Spears found his mood mildly to moderately depressed, but improved overall. She maintained his GAF score and diagnoses and slightly lowered his Cymbalta dosage.

7

Case 5:15-cv-00046-EKD-JCH   Document 19   Filed 08/09/16   Page 7 of 14   Pageid#: 1476

Dr. Spears completed a Mental Impairment Questionnaire on May 8, 2013. R. 768–73. She stated that McAfee was taking his medications, but continued to be depressed and suicidal at times. She opined that McAfee was unable to meet competitive standards in maintaining attention for two-hour segments, maintaining regular attendance and punctuality, and performing at a consistent pace without unreasonable rest. She opined that he was seriously limited, but not precluded, from remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; sustaining an ordinary routine without special supervision; dealing with normal work stress; understanding, remembering, and carrying out detailed instructions; dealing with the stress of semiskilled and skilled work; interacting appropriately with the general public; and maintaining socially appropriate behavior. She noted that he had difficulty concentrating, sitting still in group therapy, and maintaining his anger and mood. She indicated that McAfee had experienced three or more episodes of decompensation within twelve months, each at least two weeks long. Overall, she concluded that his conditions caused a moderate restriction on his activities of daily living and a marked limitation in his ability to maintain social functioning and to maintain concentration, persistence, or pace.

Though McAfee's other physicians focused primarily on his physical conditions, they did note his depression in their treatment notes and opinions. A September 14, 2012, treatment note from Jerome Hotchkiss, M.D., assessed depression, R. 747, and a September 24, 2012, treatment note from Thomas Webber, M.D., listed depression as a chronic problem, R. 540. Dr. Hotchkiss and Don Martin, M.D., both completed Physical Residual Functional Capacity Questionnaires— Dr. Martin on February 6, 2013, R. 618–19, and Dr. Hotchkiss on March 22, 2013, R. 754–58. Both noted that McAfee suffered from depression and opined that it contributed to the severity of

8

his other symptoms and functional limitations. *See* R. 619, 755. Dr. Hotchkiss also noted that McAfee's depression was, at times, stable. R. 736.

McAfee did not report mental impairments or limitations in his disability applications, *see* R. 117, 125, or his November 14, 2011, function report, R. 298–305. Apart from the medical records discussed above, the issues concerning McAfee's mental impairment, were raised for the first time at his administrative hearing, where McAfee testified that he was under care at HRCSB for anger management, alcohol abuse, substance abuse, and depression. R. 77. He said that he abuses alcohol and substances as coping mechanisms for depression and that he had relapsed with alcohol six months before the hearing when he ran out of depression medication. R. 77–78. He does not go shopping a lot because his anxiety makes it difficult for him to deal with a lot of people. R. 85. On a typical day, he tries to help his daughter catch her bus and rides in the car with others to get out of the house. R. 86–87. He also attempts to sleep, though he has difficulty sleeping and often watches television all night instead. R. 86. He does not take his prescribed sleep medication because he does not like the way it makes him feel. *Id.*

2. Analysis

At step two of the disability evaluation, an ALJ must determine which of a claimant's conditions are severe, medically determinable impairments. 20 C.F.R. § 404.1520(a)(4)(iii). A medically determinable impairment is one that is "established by medical evidence consisting of signs, symptoms, and laboratory findings, not only [a claimant's] statement of symptoms." 20 C.F.R. § 404.1508; *accord Craig v. Chater*, 76 F.3d 585, 592 (4th Cir. 1996). "Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception." 20 C.F.R. § 404.1528.

To evaluate the severity of a mental impairment, the Commissioner employs a "special technique" described in 20 C.F.R. § 404.1520a. The Commissioner must rate the degree of a claimant's functional limitation in four areas: "Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation." If a claimant's limitations in the first three areas are "none" or "mild," and if the claimant has suffered no episodes of decompensation, the ALJ "will generally conclude that [the claimant's] impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." *Id.* § 404.1520a(d)(1). In applying this special technique, the ALJ must "consider all relevant and available clinical signs and laboratory findings, the effects of [the claimant's] symptoms, and how [the claimant's] functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment." *Id.* § 404.1520a(c)(1).

An impairment should be labeled "not severe only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere" with an applicant's ability to work. *Evans v. Heckler*, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks omitted); *Waller v. Colvin*, No. 6:12cv63, 2014 WL 1208048, at *7 (W.D. Va. Mar. 24, 2014) (citing *Evans*, 734 F.2d at 1014). This is "not a difficult hurdle for the claimant to clear," *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 474 n.1 (4th Cir. 1999); yet, the claimant bears the burden of producing sufficient proof to clear it. *See Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012).

The ALJ determined that McAfee's mental conditions did not constitute severe impairments. R. 31. He first noted that McAfee asserted mental impairments for the first time at his administrative hearing, then stated:

> The claimant testified at his hearing that he had been going to [HRCSB] for anger management, alcohol abuse, substance dependence, and depression. The evidence shows that the claimant completed a substance abuse program in May 2013. It also shows that the claimant's symptoms have been controlled with routine medication checks and that there have not been significant ongoing psychological signs on examinations.
>
> . . .
>
> As there has been no showing made of a mental impairment that has resulted in more than mild functional limitations (i.e., restrictions in daily activities, social functioning, or maintaining concentration, or any episodes of decompensation of extended duration) during the period at issue, lasting or expected to last a continuous period of at least 12 months as required by the regulations . . . no "severe" mental impairment is found to exists since the claimant's alleged onset date.

R. 31–32. While evaluating Dr. Spear's opinion, the ALJ also stated, "[t]he claimant's limited mental health treatment sought on his own and not recommended by any treating physician, with no psychiatric hospitalizations, does not establish the existence of a mental impairment resulting in work related limitations of functioning for 12 continuous months." R. 47. The ALJ ultimately assigned Dr. Spears's opinion "little weight," R. 45, finding it contradicted and overstated McAfee's treatment notes, R. 46–47.

The record does not support the ALJ's step two conclusion. Treatment notes from HRCSB document continuous diagnoses of mental health impairments from August, 2012, through July 9, 2013, and a specific diagnosis of depression from January onward. Throughout that time, caregivers consistently recorded psychiatric signs in support of these diagnoses, including a depressed, sad, and anxious mood; a blunted, depressed, restricted, and dysphoric affect; and experiences of suicidal ideation, violent ideation, sleep disturbance, low energy, and anhedonia. Treatment notes also indicated that McAfee's conditions interfered with his ability to concentrate and interact with others without anger. The ALJ's recitation of the medical records from the HRCSB does not acknowledge most of the documented signs and symptoms from McAfee's mental impairment. *See* R. 40–41.

11

The ALJ's conclusion that McAfee's symptoms were controlled with routine medication checks is likewise unsupported. Though the record indicates that McAfee benefited from Cymbalta, caregivers continued to note signs of depression and anxiety after he began medication, and McAfee's admittance to HRCSB's crisis facility for suicidal ideation occurred six months after he began using Cymbalta. McAfee's continued symptoms after eleven months of treatment also undermine the ALJ's determination that his mental health issues would not be expected to continue for at least twelve months.

Furthermore, three of McAfee's treating physicians opined that his depression contributed to his functional limitations. Dr. Spears found that he was significantly or preclusively limited in his ability to perform many work-related tasks and markedly limited in his ability to maintain social functioning and maintain concentration, persistence, or pace. The ALJ is certainly entitled to assign less weight to Dr. Spears's opinion to the extent he finds it does not align with other evidence. For example, the ALJ is justified in questioning Dr. Spears's statement that McAfee had experienced three two-week long episodes of decompensation, as the record contains no evidence of those episodes. Nevertheless, in order to conclude that McAfee's mental impairments have such a minimal effect as to not interfere with his ability to work, the ALJ has to completely disregard all of Dr. Spears's findings, Dr. Hotchkiss and Dr. Martin's opinions, and the eleven-month history of mental health treatment and psychiatric findings.

Demonstrating the existence of a severe impairment is "not a difficult hurdle for the claimant to clear." *Albright*, 174 F.3d at 474 n.1. Based upon the treatment notes and opinion evidence in the record, I cannot find that substantial evidence supports the ALJ's conclusion that McAfee's mental impairments constitute such "a *slight abnormality* which has such a *minimal effect* [that they] would not be expected to interfere" with his ability to work. *Evans*, 734 F.2d at

1014. When an ALJ has found at least one severe impairment, any failure to find another impairment severe may be harmless if the ALJ considers all of the claimant's impairments in assessing how much work a claimant can still do. *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013); *Delia v. Comm'r of Soc. Sec.*, 433 F. App'x 885, 887 (11th Cir. 2011); *Carpenter v. Astrue*, 537 F.3d 1264, 1265–66 (10th Cir. 2008); *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007); *Powell v. Astrue*, 927 F. Supp. 2d 267, 274–75 (W.D.N.C. 2013). In this case, however, the ALJ did not include any limitations related to mental impairments in his RFC or hypothetical to the VE, and he did not adequately explain why the medical and opinion evidence did not warrant any such limitations. Thus, his error at step two of the analysis was not harmless.

B.  *Listings Analysis*

As I find remand appropriate for the ALJ's error at step two, I will not evaluate McAfee's other arguments on appeal. Nevertheless, I note a disagreement between the parties as to the applicable listing for this case. At McAfee's counsel's prompting, the ALJ primarily evaluated McAfee's shoulder injury under Listing 1.08, soft tissue injury, but also briefly considered Listing 1.02, major upper extremity joint dysfunction, and Listing 11.14, neuropathy. R. 32–33. On appeal, McAfee maintains that Listing 1.08 is correct, while the Commissioner contended at oral argument that Listing 1.02 or 11.14 is more applicable. On remand, the Commissioner should conclusively determine the appropriate listing for analysis of McAfee's shoulder condition.

IV. Conclusion

For the foregoing reasons, I recommend that the presiding District Judge **GRANT** McAfee's Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's Motion for

Summary Judgment, ECF No. 15, **REVERSE** the Commissioner's final decision, and **REMAND** this case for additional administrative proceedings.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation,] any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Elizabeth K. Dillon, United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 9, 2016

Joel C. Hoppe
United States Magistrate Judge